IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HART INTERCIVIC, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 1:09-cv-678 |
| | : | |
| DIEBOLD, INCORPORATED and | : | **JURY TRIAL DEMANDED** |
| ELECTION SYSTEMS & SOFTWARE, INC. | : | |
| | : | |
| Defendants. | : | |

**AMENDED COMPLAINT FOR PRELIMINARY AND
PERMANENT INJUNCTION AND FOR DAMAGES**

Plaintiff, Hart InterCivic, Inc. ("Hart"), based on Rule 15(a), F.R.Civ.P. and not having been served with a responsive pleading or having previously amended its complaint without leave of court, submits the following Amended Complaint as a matter of course:

Hart brings this civil action against Diebold, Incorporated ("Diebold") and Election Systems & Software, Inc. ("ES&S"), and alleges as follows:

**I.      JURISDICTION AND VENUE**

1.      This court has subject matter jurisdiction and jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1337 and over the federal antitrust claims asserted herein under Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

2.      Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, in that this case involves the acquisition of the outstanding shares of capital stock of Premier Election Solutions, Inc., a Delaware domestic corporation by

an acquiring party, ES&S, that is also a Delaware domestic corporation. Both defendants are found and transact business in the District of Delaware and throughout the United States.

3.  Defendants are engaged in "commerce," as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12(a). Defendant's conduct has and will have a substantial, direct, and reasonably foreseeable effect on interstate commerce.

## II.    THE PLAINTIFF

4.  Plaintiff, Hart, is a for-profit corporation existing and doing business under the laws of the State of Texas organized on June 13, 1986 having its principal offices at 15500 Wells Port Drive, Austin, Texas 78728. The founders of Hart have been printing election ballots and serving the voting machine and election systems market since 1912. Hart presently serves approximately 9% of the approximately 180,000 voting precincts in the United States.

## III.    THE ULTIMATE PARENT ENTITIES

5.  The defendants, Diebold and ES&S, Hart's two largest competitors, are the ultimate parent entities involved in the stock and/or asset transaction that is the subject of this case.

**A.    Defendant Diebold**

6.  Diebold is a corporation existing and doing business under the laws of the State of Ohio organized on August 11, 1876 having its principal place of business at 5995 Mayfair Road, North Canton, Ohio 44720. Diebold is a diversified manufacturing company specializing in ATM's and other banking equipment.

7.  Diebold is the ultimate parent entity of Diebold Election Systems Holding Company, Inc., a Delaware general corporation organized on June 24, 2002.

8.  Diebold is the ultimate parent entity of Global Election Systems, Inc. ("GES"), a Delaware general corporation organized on December 6, 1991 having its principal place of business at

1253 Allen Station Parkway, Allen, Texas 75002. On March 18, 2002 GES changed its name to Diebold Election Systems, Inc. ("DES"). On September 12, 2007 DES changed its name to Premier Election Solutions, Inc. ("PES"). Diebold is the ultimate parent entity of PES by virtue of its acquisition of GES in 2002. PES presently serves approximately 23% of the voting precincts in the United States.

9.  Diebold is the ultimate parent entity of Data Information Management Systems, Inc., ("DIMS"), a California corporation organized on February 9, 1981, by virtue of having acquired the capital stock and/or assets of DIMS on or about January 23, 2003. DIMS provides information technology resources to PES and its customers.

10. Diebold is the ultimate parent entity of Premier Canada, a vendor of voting machines and election systems to Canadian jurisdictions.

**B.  Defendant ES&S**

11. ES&S is a corporation existing and doing business under the laws of the State of Delaware organized on April 25, 1988 having its principal place of business at 11208 John Galt Blvd., Omaha, Nebraska 68137. ES&S is successor-in-interest to American Information Systems, Inc., which, in 1997, acquired the election systems division of Business Records Corporation. ES&S serves approximately 45% of the voting precincts in the United States.

12. ES&S is its own ultimate parent entity.

## IV.  THE OTHER VENDORS

13. Sequoia Voting Systems ("Sequoia") is a vendor of voting machines and election systems that serves approximately 18% of the voting precincts in the United States.

14. Dominion Voting Systems, Inc. ("Dominion") is a Toronto, Canada-based vendor of voting machines and election systems that serves approximately 5% of the voting precincts in the United States.

## V.     THE SEPTEMBER 2 ACQUISITION

15. On September 2, 2009 Diebold and ES&S agreed and consummated a transaction in which ES&S would acquire from Diebold all the outstanding capital stock of PES and DIMS and the assets of Premier Canada.

16. On September 3, 2009 Diebold filed Form 8-K with the United States Securities and Exchange Commission disclosing that it had sold the capital stock of PES and DIMS and the assets of Premier Canada to ES&S (Exhibit "A," attached).

17. The September 3, 2009 Form 8-K discloses that

> [Diebold's] sale of the election systems business (the 'Divestiture') was consummated simultaneously with the entry into the Purchase Agreement on September 2, 2009.

18. The Form 8-K further discloses that

> [Diebold] has also entered into a non-competition agreement with ES&S pursuant to which [Diebold] has agreed not to provide election products and services within the United States, its territories or Canada.

19. The Form 8-K further discloses that

> [a]s a condition to the transaction, [Diebold] entered into a transition services agreement with ES&S pursuant to which the [Diebold] will facilitate an orderly transfer of the business to ES&S and provide certain transition services.

20. On September 3, 2009 ES&S issued a press release announcing its acquisition of PES (Exhibit "B," attached).

## VI.    NATURE OF THIS ACTION

21. Plaintiff brings Count I of this action against defendants, Diebold and ES&S, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, for a preliminary and permanent injunction and other equitable relief on the grounds that defendants' violation of Section 7 of the

4

Clayton Act, 15 U.S.C. § 18, poses a significant and imminent threat of irreparable antitrust injury to plaintiffs. The transaction also poses a significant and imminent threat of irreparable harm to the other vendors like Hart serving less than 20% of voting precincts, harm to the political subdivisions that constitute the jurisdictions that must purchase voting machines and election systems, and, ultimately, harm to the voters of the United States, in the form of loss of confidence in the integrity and security of the means by which elections are performed.

22. Plaintiff brings Counts II and III of this action against defendant, ES&S, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for damages for injury to plaintiff's business and property resulting from anticompetitive and exclusionary conduct by ES&S in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

23. Plaintiff brings Count IV of this action against defendants, Diebold and ES&S, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for conspiracy to monopolize the market for voting machines and election systems in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## VII.   TRADE AND COMMERCE

**A.   The Nature of the Market for Voting Machines and Election Systems**

24. To conduct elections, states, counties and municipalities ("jurisdictions" or "customers") procure voting machines and election systems. Procurement across the United States occurs through a series of competitive bidding contests initiated by jurisdictions. Typically, a jurisdiction will publish a Request for Proposal ("RFP") to which vendors respond with specifications and bids. Bids are customarily submitted to provide a turn-key election system. An RFP may call for procurement of equipment, software, installation, training, ballot printing and programming, pre-election testing, maintenance, repairs, election-day assistance,

results tabulation, trouble shooting, investigation, and recount management.

25. Election systems are ordinarily designed to provide a useful service life over several 2- and 4-year election cycles. Accordingly, the term length of the contracts awarded by jurisdictions are frequently 1 - 10 years. The services to maintain and manage the election system must nearly always be provided throughout the multi-year life of the contract by the system vendor because in most cases it is impractical or impossible to obtain aftermarket services for an election system from a vendor other than the vendor that originally designed, fabricated, and delivered the system. As a result, jurisdictions are frequently "locked-in" to a vendor once a contract is awarded. Unscrupulous vendors can exploit the effect of lock-in to engage in price gouging. Some vendors also strategically strengthen customer lock-in by restricting customer access to the software source code and other intellectual property that controls the system.

26. Voting machines and election systems are subject to testing and certification requirements as overseen by the United States Election Assistance Commission ("EAC") and by the individual states. Testing and certification is difficult, costly and time consuming, involving several years of product development before the products may be submitted to a lengthy certification process.

27. Not all vendors bid in all contests. Some vendors will not be qualified, depending on the requirements of the RFP. Requirements that call for a particular product feature or type of service, or for specific state or federal system certification, will often eliminate potential bidders.

28. Diebold and ES&S desire to, and do, influence the content of RFPs and the outcome of the competitive bidding contests, through both legitimate and illegitimate acts and conduct.

**B.     The Relevant Market**

29.     The relevant antitrust product market is the market for voting machines and election systems which is a line of commerce within the meaning of Section 7 of the Clayton Act.

30.     The relevant antitrust geographic market is the United States and Canada within the meaning of Section 7 of the Clayton Act.

31.     Competition in the relevant market is strengthened the more vendors submit bids on contests conducted by jurisdictions. Competition is harmed where fewer vendors bid.

**C.     Market Concentration**

32.     The U.S. market for voting machines and service is highly concentrated. The following table, based on publicly available data, uses the Herfindahl-Hirschman Index ("HHI") as a measure of market concentration:

HHI Before September 2 Acquisition

| Company | # Precincts | % | HHI |
|---|---|---|---|
| ES&S | 83098 | 45.41 | 2061.82 |
| Diebold | 41704 | 22.79 | 519.31 |
| Sequoia | 32405 | 17.71 | 313.54 |
| Hart | 16713 | 9.13 | 83.40 |
| Dominion | 9086 | 4.96 | 24.65 |
| Total | 183006 | 100 | 3002.72 |

HHI After September 2 Acquisition

| Company | # Precincts | % | HHI |
|---|---|---|---|
| ES&S | 124802 | 68.20 | 4650.64 |
| Sequoia | 32405 | 17.71 | 313.54 |
| Hart | 16713 | 9.13 | 83.40 |
| Dominion | 9086 | 4.96 | 24.65 |
| Total | 183006 | 100 | 5072.23 |
| | | Difference: | 2069.51 |

33.     As a result of the September 2 acquisition, ES&S will serve more than 68% of all U.S. election precincts and the number of possible independent competitors qualified to bid on

any future contract let by a jurisdiction will be reduced from five to four. The proposed transaction will increase the HHI in voting machines and election systems from 3,003 points to a post-acquisition level of 5,072 points, or an increase of 2,069 points. Under the Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines (rev. 1997, § 1.51), markets with an HHI above 1,800 are considered highly concentrated, and "[w]here the post-merger HHI exceeds 1,800, it will be presumed [by the agencies] that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." Starting from a pre-acquisition position of 3,002 (nearly twice the level indicative to the DOJ and FTC of an already highly concentrated market), the September 2 acquisition by ES&S will result in an increase of more than <u>20 times</u> the magnitude that raises a presumption that competition substantially will be lessened.

### D. Anticompetitive Practices by Diebold and ES&S Prior to the September 2 Acquisition

34. As a consequence of the unique feature of the voting machines and elections systems market, for almost one hundred years, it has been the policy of Hart to treat the integrity and security of its election products and services as its most valuable asset. Hart's customers experience high satisfaction rates and are overwhelmingly loyal.

35. By contrast, Diebold and ES&S both experience low customer satisfaction and are overwhelmingly criticized by election officials responsible for procuring systems. This is due, in part, to the pattern of anticompetitive and monopolistic conduct in which Diebold and ES&S have engaged for many years. The September 2 acquisition all but confirmed the monopolistic animus in the hearts of Diebold and ES&S executives as evidenced by their past record of anticompetitive conduct.

36. Diebold and ES&S systematically

    a. win bids by bidding low and then gouging locked-in customers for aftermarket service and equipment;

    b. misrepresent by exaggerating the features, capabilities, or certification status of their systems, or by falsely disparaging the features, capabilities, or certification status of rival systems;

    c. engage in strategies that raise their rivals' costs;

    d. impose unreasonable restrictions on access to software and other intellectual property;

    e. exert improper and undue influence on government officials to achieve favorable competitive bidding outcomes; and

    f. initiate litigation upon losing competitive bidding contests to establish a litigious reputation among customers, adding a risk premium to the cost of choosing a rival system.

37. In February 2008 VoterAction.Org posted "Examples of State and Local Government Actions Against Deceptive and Other Unlawful Practice by Voting Machine Companies" (Exhibit "C," attached) citing specific examples of customer dissatisfaction and contractual and other legal disputes between various jurisdictions and Diebold and ES&S.

38. On July 19, 2007 Leonard C. Piazza III, Director of Elections for the County of Luzerne, Pennsylvania, wrote to the Pennsylvania Department of State regarding the difficulty faced by the county in meeting a demand by ES&S for $300,000 for an extended warranty (Exhibit "D," attached). The letter states:

> The fact is, ES&S refuses to lower the pricing structure, is unwilling to restructure the coverage plan to meet the needs of the

> counties and ES&S has not answered our repeated requests for the exact terms and condition of the extended warranty plan. As it turns out, ES&S misleads its customers in the Commonwealth, and judging from conversations with other election directors at a recent election officials' conference in Portland, Oregon—other jurisdictions as well.

39. The letter also refers to the inferior bargaining power of the jurisdiction and the market power and informational asymmetry of the jurisdiction and ES&S *inter se*:

> In addition to not being able to meet the financial burden that ES&S is asking us to meet, we cannot individually deal with such a large, multi-national corporation and the mix of deception this company promulgates and respectfully ask the Commonwealth, specifically, the Department of State, for its leadership in insuring that the voting-system vendors doing business here do not have the opportunity to threaten a democratic process with such unsavory business practices that vendor, such as ES&S, seemingly have a deep commitment to employing.

40. On or about March 5, 2006 VotersUnite.Org posted a story attributed to <u>The Columbus Dispatch</u> on that date (Exhibit "E," attached) quoting Ray Feikert, a Holmes County, Ohio County Commissioner, on the subject of unexpectedly large aftermarket expenses connected with a Diebold contract: "This completely blind-sided the county. It's kind of a back-door expense that no one saw coming."

41. On March 11, 2004 Indiana Election Commissioner Brian Burdick was quoted at VerifiedVotingFoundation.Org speaking to ES&S personnel: "I just think I was absolutely lied to by your CEO and I'm more than on the slow burn about it. I sat in this room and you all lied to me."

42. On December 16, 2003 TheRegister.co.uk published internal Diebold e-mails (Exhibit "F," attached) boasting about the company's ability to gouge customers that "already bought the system" permitting them to "charge out the yin." The Diebold CEO is reported to have written in early 2003, "I am committed to helping Ohio deliver its electoral votes to the

10

president next year."

43.     Some of ES&S' anticompetitive conduct has been directed specifically at Hart and has injured Hart in its business or property by causing Hart to lose revenue and/or incur unnecessary expense. On one occasion in late 2007, ES&S asserted significant influence to pressure the Cuyahoga County, Ohio Director of Elections and County Commission to award a contract to ES&S despite its significantly higher cost to the County. On another occasion, after an Orange County, California County Commission task force recommended Hart's election system, ES&S circulated a flyer to the Commission consisting of ten false statements about the Hart system (falsely claiming, for example, that Hart machines could not be operated in foreign languages or were not compliant with the Americans with Disabilities Act). Litigation by ES&S over the award of a 10-year contract to Hart by the State of Hawaii resulted in a truncation of the contract to a single year.

**E.     Likely Anticompetitive Effects of the September 2 Acquisition**

44.     The likely effect of the September 2 acquisition will be to substantially lessen competition and tend to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act. Unless restrained and unwound, the transaction likely will have the following effects on competition:

        a.     actual competition between ES&S and Premier/DIMS will be eliminated;

        b.     competition generally in the manufacture and service of voting machines will be substantially lessened;

        c.     prices for voting machines and services will increase;

        d.     the quality and choice of products and services available for installation in the various precincts will decrease; and,

   e.  innovation in new products and services will suffer.

  45.  Unless restrained and unwound, the September 2 acquisition will vest ES&S with excessive market power and undue influence over competitive bidding contests by:

   a.  significantly reducing the number of qualifying bidders for future election systems contracts;

   b.  imparting ES&S with excessive influence over the scope and content of jurisdictions' RFPs;

   c.  giving control of an unduly large proportion of the industry-wide budget for research and development in products, software, and services related to election systems, and, thus, control over the path and pace of industry innovation, to a single firm with a reputation for a lack of innovation;

   d.  rendering it easier for ES&S to pursue lowball bidding with back-loading and strategies that raise rivals' costs.

  46.  New entry is not likely to thwart these anticompetitive effects. New entrants are not likely to perceive that this market offers any reasonable business opportunities where an enormous sunk investment in time and resources is the price of admission to compete in a market dominated by an incumbent firm with a nearly 70% share of the market.

  47.  Plaintiff has been required to retain the undersigned counsel to prosecute this cause.

## VII. COUNT I

### (Injunctive Relief Against Diebold and ES&S, 15 U.S.C. § 18)

  48.  If the September 2 acquisition is permitted to stand, the prices of voting machine equipment and services are likely to increase, the choice and quality of products and services

available to election officials in the United States is likely to decrease, innovation in voting systems and the introduction of new products is likely to suffer, and rival manufacturers are likely to exit the voting machine market. As a result, competition in the market for voting machines and election systems, jurisdictions that purchase voting machines and election systems, and the taxpayers that support them, and smaller rivals to ES&S, including plaintiff, are threatened with irreparable harm.

49. The September 2 acquisition threatens imminent and irreparable harm that injures plaintiff because the acquisition will undermine plaintiff's ability to retain its present customers and foreclose it from opportunities to obtain additional customers. Unless restrained and unwound, the Hart will face higher costs to capture market share from the merged entity or to retain market share that it already serves, ES&S will more easily achieve regulatory capture in connection with competitive bidding contests by jurisdictions and will exert greater undue influence over the specification of RFPs. As Hart and the other smaller rivals become unable to provide effective competitive bids the ultimately will be driven out of business.

50. The September 2 acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, which violation significantly threatens Hart and the other vendors with injury of the type the antitrust laws were intended to prevent and that flows from that which makes the September 2 acquisition unlawful.

51. Plaintiff, Hart, seeks an order declaring the transaction unlawful and requiring ES&S to divest its interests in PES, Premier Canada and DIMS and for other equitable relief because the transaction significantly increases ES&S's share of the highly concentrated market for voting machines and election systems, substantially lessening competition and tending to create a monopoly in that market.

52. As a large vendor of election systems, Diebold has shown a tendency to favor one side or another in elections, giving them an interest in the outcome. Accordingly, the lessening of customer choice of vendors of election systems that will result from the September 2 acquisition directly impairs the integrity of the voting process in the United States.

53. Permanent and temporary injunctive relief is necessary to prevent imminent threat of antitrust injury to plaintiff. Temporary relief to maintain the status quo during the pendency of this litigation is required to prevent irreparable harm to plaintiff and so as not to deprive this Court of a full range of remedies, including alternative arrangements for the disposition of the capital stock and/or assets of PES, Premier Canada and DIMS, that do not violate the law. Accordingly, the integration process in which Diebold has contracted with ES&S to provide transition services should be immediately suspended. In the absence of temporary relief, Diebold's present customers are subject to being locked-in to ES&S, alternative arrangements for the disposition of PES, Premier Canada and DIMS will be more difficult, and plaintiff will be foreclosed from competing for a large segment of customers.

54. The likelihood and severity of irreparable harm to the plaintiffs if the requested injunctive relief is denied would greatly outweigh the likelihood of harm to defendants if the requested injunctive relief is granted.

55. Plaintiffs are likely to succeed on the merits of its claim. 56. The public interest would be better served if the requested injunctive relief is granted.

## VIII.   COUNT II

### (Monopolization by ES&S, 15 U.S.C. § 2)

57.   As a result of its pattern of past anticompetitive conduct ES&S has monopolized the market for voting machines and election systems by means other than superior product, foresight and industry, and possesses monopoly power in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

58.   Plaintiff has been directly and proximately injured by ES&S' anticompetitive conduct by having been damaged in its business or property, which injury is of the type the antitrust laws were intended to prevent and that flows from that which makes ES&S' conduct unlawful.

## IX.   COUNT III

### (Attempted Monopolization by ES&S, 15 U.S.C. § 2)

59.   As a result of its past pattern of anticompetitive conduct, ES&S possesses a dangerous probability of monopolizing the market for voting machines and election systems by means other than superior product, foresight and industry, and a dangerous probability of obtaining monopoly power in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

60.   Plaintiff has been directly and proximately injured by ES&S' anticompetitive conduct by having been damaged in its business or property, which injury is of the type the antitrust laws were intended to prevent and that flows from that which makes ES&S' conduct unlawful.

## X.    COUNT IV

### (Conspiracy to Monopolize against Diebold and ES&S, 15 U.S.C. § 2

61.    Diebold and ES&S conspired to monopolize the market for voting machines and election systems by entering into and consummating the September 2 acquisition.

62.    Plaintiff has been directly and proximately injured by Diebold and ES&S' conspiracy to monopolize by having been damaged in its business or property, which injury is of the type the antitrust laws were intended to prevent and that flows from that which makes such a conspiracy unlawful.

## XI.    REQUESTED RELIEF

WHEREFORE, plaintiffs seek the following relief:

A.    A declaration that the September 2 acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.    An temporary order enjoining defendants from proceeding to integrate the acquired companies into the operations of ES&S and requiring defendants to hold the assets acquired in the transaction separate during the pendency of this litigation;

C.    A permanent order requiring ES&S to divest its interests in PES, Premier Canada and DIMS and for a novation of the September 2 acquisition;

D.    An order awarding plaintiff three-fold damages directly and proximately caused by ES&S' anticompetitive conduct, monopolization, and attempted monopolization of the relevant market and the defendants' conspiracy to monopolize, and trial by jury of all issues so triable as of right;

E.    An order awarding a reasonable attorneys' fee and the costs of this suit; and,

F.    Such other further temporary and permanent equitable relief as may be reasonably

likely to cure the threatened harm to plaintiff and to competition in the relevant market caused by the unlawful acquisition.

                                           PROCTOR HEYMAN LLP

                                           /s/ Kurt M. Heyman
                                           Kurt M. Heyman (# 3054)
                                           E-mail:  kheyman@proctorheyman.com
                                           Patricia L. Enerio (# 3728)
                                           E-mail:  penerio@proctorheyman.com
                                           1116 N. West Street
                                           Wilmington, DE 19801
                                           (302) 472-7300
                                           Attorneys for Plaintiffs

OF COUNSEL:

PATTON BOGGS, LLP
Jonathan L. Rubin
2550 M Street, NW
Washington, DC 20037
(202) 457-6531


Dated:  September 14, 2009