<u>NOT FOR PUBLICATION</u>                                      (Docket No. 5)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____
                                                    :
HART INTERCIVIC, INC.,                 :
                                                    :
                        Plaintiff,            :        Civil No. 09-678 (RBK)
                                                    :
            v.                                    :        **OPINION**
                                                    :
DIEBOLD, INC., et al.,                    :
                                                    :
                        Defendants.         :
_____:

**KUGLER**, United States District Judge:

On September 2, 2009 Defendant Election Systems ("ES&S") acquired the capital stock

and/or assets of three subsidiary companies of Defendant Diebold, Inc. ("Diebold").  Plaintiff

Hart Intercivic, Inc. ("Plaintiff" or "Hart") has moved for a preliminary injunction and a

temporary restraining order enjoining ES&S and Diebold (collectively, "Defendants") from

proceeding to integrate the acquired companies into the operations of ES&S and requiring

Defendants to hold the assets acquired separate during the pendency of this litigation.

**I.      BACKGROUND**

Across the country, states and political sub-divisions procure voting machines and

elections systems from private vendors through a competitive bidding system.  Election systems

are typically marketed and may be sold as complete "turn-key" packages, and may include (a)

equipment; (b) software; (c) installation; (d) training; (e) ballot printing and programming; (f)

pre-election testing; (g) maintenance; (h) repairs; (i) election-day assistance; (j) results

1

tabulation; (k) investigation; and (l) recount management.  An average contract contemplates a business relationship of between one and ten years.

Prior to the passage of the Help America to Vote Act of 2002, 42 U.S.C. § 15301, et seq. ("HAVA"), a large number of companies provided relatively simple and inexpensive voting machines and services to voting precinct customers.  The enactment of HAVA increased the sophistication and expense of voting machines and services.  For example, a jurisdiction that paid between three and eight thousand dollars annually for election equipment and services pre-HAVA, can now expect to pay ten to twenty times as much.  As prices have risen, so too has the cost of switching providers. Moreover, it is becoming increasingly impractical for customers to switch to different providers as competing election machines and systems are largely incompatible with one another.  Although a number of firms rushed to enter the market directly following HAVA's enactment, those companies, and many of the preexisting smaller election service companies, have been driven out of business.

According to Plaintiff, the current market for voting machines and election systems is "highly concentrated."  Prior to the September 2, 2009 acquisition, five companies constituted the voting machine and election systems market.  The largest, ES&S, served approximately 45% of United States' voting precincts.  Diebold, through its subsidiary Premier Election Solutions, Inc. ("PES"), served approximately 23% of the precincts.  The rest were served by Sequoia Voting Systems (18%), Hart (9%), and Dominion Voting Systems (5%).  According to Plaintiff's calculations, this resulted in a total Herfindahl-Hirschman Index[1] ("HHI") of 3002.72.

---

[1]   "HHI is a measure of market concentration calculated by squaring the market share of each firm in the market and then summing the squares.  The HHI takes into account the relative size and distribution of the firms in a market.  The HHI approaches zero when the market

Allegedly, Diebold and ES&S have been engaged in anti-competitive practices for some time.  Defendants' past anti-competitive conduct allegedly includes: (1) low-bidding to acquire contracts followed by price gouging "locked-in" customers for aftermarket services and equipment; (2) misrepresenting the capabilities of their election systems and falsely disparaging the capabilities of their competitors' systems; (3) engaging in strategies to raise their rivals' costs; (4) imposing unreasonable restrictions on access to software and other intellectual property; (5) exerting improper and undue influence on government officials; and (6) initiating litigation against competitors for improper purposes.

Since 2007, Diebold has been considering divesting itself of PES.  PES was experiencing difficulty certifying its products for 2008, faced significant legal liabilities, and was losing money.  In 2008, for example, PES lost $9 million, and as of August 31, 2009, PES had lost approximately $11 million.  PES was also severely delinquent in delivery of a statewide voter registration system to the State of Alaska.  According to Defendants, Diebold began searching for a company to purchase PES.  In early August 2007, Hart expressed an interest in creating a joint venture with PES.  Diebold made an offer, and Hart rejected it.  Hart countered that it would find another partner to buy PES outright, but no deal ever materialized, and Hart had postponed all discussions as of June 2009.[2]  At that point, PES seriously considered dissolving the business entirely as it could no longer financially justify continued operation.

---

consists of a large number of firms of relatively equal size and reaches a maximum when a market is a monopoly."  United States v. Tote, Inc., 768 F. Supp. 1064, 1070 n.6 (citing U.S. Dep't of Justice Merger Guidelines § 3.1 (1984)).

[2]  Plaintiff vigorously contests Defendants' assertions and claims it was Diebold who terminated discussions.  The Court cannot resolve that dispute at this time.

On September 2, 2009, Diebold and ES&S agreed to and consummated a transaction in which ES&S would acquire from Diebold all outstanding capital stock of PES and another Diebold subsidiary, Data Information Management Systems ("DIMS"), which provides information technology resources to PES, as well as the assets of a third Diebold subsidiary, Premier Canada, which is a vendor of voting machines and election systems to Canadian jurisdictions (the "Acquisition") for $5 million in cash plus 70% of PES's accounts receivable as of August 31, 2009.  The Acquisition is expected to result in a $45-$55 million pre-tax loss to Diebold.  Diebold filed a Form 8-K[3] with the United States Securities and Exchange Commission ("SEC") disclosing the sale and accompanying agreements not to compete and to assist in the orderly transfer.[4]

ES&S alleges that the combined entities will operate more efficiently and effectively post-Acquisition.  After the Acquisition, the market for voting machines and election systems is served by only four companies.  ES&S now serves approximately 68% of the voting precincts, resulting in a total market HHI of 5072.23.  This represents an HHI increase of 2069.51 points.

On September 11, 2009, Plaintiff filed a Complaint, which it amended three days later. The Amended Complaint sounds in four counts, alleging various violations of federal anti-trust law.  Plaintiff claims that the likely effect of the Acquisition will be to lessen competition in the market for voting machines and election services, increase prices, decrease product quality and diversity, and impoverish innovation.  Count One alleges that the Acquisition violated Section 7

---

[3]  Form 8-K is the "current report" companies must file with the SEC to announce major events that shareholders should know about.  See U.S. Sec. and Exch. Comm'n, http://www.sec.gov/answers/form8k.htm (last visited Sept. 29, 2009).

[4]  The purchase price seems very modest.  In 2008, PES generated $88 million in revenue.

of the Clayton Act, 15 U.S.C. § 18 ("Section 7"), and requests immediate and permanent

injunctive relief.[5]  Counts Two through Four allege that the Acquisition, in concert with

Defendants' pre-Acquisition anti-competitive activity, constitutes monopolization, attempted

monopolization, and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15

U.S.C. § 2.  In addition to injunctive relief, Plaintiff also requests treble damages.

On September 18, 2009, the United States Department of Justice (the "Department") sent

a letter to ES&S, indicating that it was continuing its investigation into the Acquisition's possible

anti-competitive effects, requesting compliance with information requests, and asking ES&S to

cease integrating with PES.  ES&S asserts that it is discussing the issue with the Department.

On September 23, 2009, Plaintiff filed the instant Motion for a Temporary Restraining

Order or Preliminary Injunction.

## II.   DISCUSSION

"A preliminary injunction is an extraordinary remedy that should be granted only if '(1)

the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the

plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4)

granting the injunction is in the public interest." Nutrasweet Co. v. Vit-Mar Ent., 176 F.3d 151,

153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir. 1998)).  The

plaintiff bears the burden to establish each element.  Harris v. Ricci, No. 08-1014, 2008 WL

3843519, at *2 (D.N.J. Aug. 14, 2008) (citing P.C. Yonkers, Inc. v. Celebrations the Party and

Seasonal Superstore, LLC, 428 F.3d 504 (3d Cir. 2005)).  The Court may employ the same

---

[5]  As to permanent injunctive relief, Plaintiff requests an order requiring ES&S to divest
its interests in PES, Premier Canada, and DIMS and for a novation of the Acquisition.

5

standard in considering whether or not to order temporary injunctive relief.  Id.

Plaintiff's request for mandatory divestiture is a request for mandatory injunctive relief.
See Commonwealth of Pennsylvania v. Russell Stover Candies, Inc., No. 93-1972, 1993 WL
145264, at *7 (E.D. Pa. 1993).  Where a plaintiff seeks a mandatory preliminary injunction,
rather than a prohibitory preliminary injunction, the burden of showing an entitlement to relief is
greater.  Sanofi-Aventis U.S. LLC v. Novo Nordisk, Inc., No. 06-1369, 2006 U.S. Dist. LEXIS
69150, at *20 (D.N.J. June 22, 2006); see Acierno v. New Castle County, 40 F.3d 645, 653 (3d
Cir. 1994) (citing Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)) ("A party seeking a
mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden
in demonstrating its necessity.").

In this case, all factors compel denial of this motion.  Plaintiff has failed to clearly show
that it will suffer imminent harm or that much of the harm can not be remedied by money
damages.  Moreover, granting the relief may cause great harm to Defendants because PES's dire
financial condition makes it much more likely that PES will fail with the issuance of an
injunction than Hart will fail without one.  Finally, the public good will be best served by
denying the relief because, if PES fails, 206 customers will be in jeopardy of being without
election services in upcoming elections.

A.    **Likelihood of Success on the Merits**[6]

Plaintiff argues that it is likely to succeed on the merits because it can show that the
newly merged entity controls 68% of the market share in an already highly concentrated market.

---

[6]  At the outset, the Court should note that Plaintiff's request for injunctive relief is
predicated solely on the alleged violation of Section 7 of the Clayton Act.  Accordingly, this
opinion only addresses Plaintiff's likelihood of success on Count One.

Defendants counter that Plaintiff's use of installed base to measure market share is misleading and that its acquisition of a dying company will not decrease competition in the voting machine and election services market.  Defendants also argue that Plaintiff lacks antitrust standing.

### 1.      Standing

Although Section 16 of the Clayton Act, 15 U.S.C. § 26 (2006) ("Section 16"), authorizes private suits for injunctive relief,[7] a plaintiff must nonetheless demonstrate that he has standing to bring suit.  To establish standing under Section 16, a plaintiff must show "antitrust injury," defined as "threatened loss or damage 'of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 113 (1986) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1997)).  In determining whether a plaintiff has antitrust standing, courts must keep in mind that the "antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" E.g., BanxCorp v. Bankrate, Inc., No. 07-3398, 2008 WL 5661874, at *4 (D.N.J. July 7, 2008) (quoting Brown Shoe v. United States, 370 U.S. 294, 325 (1962)).

In Cargill, Inc. v. Monfort of Colordo, Inc., the Supreme Court considered whether a competitor has standing to sue to enjoin the merger of competitors.  In Cargill, the nation's fifth largest beef packer sued to enjoin a prospective merger between the nation's second and third

---

[7] Title 15 U.S.C. § 26 provides, in pertinent part:
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity. . . .

largest beef packers.  479 U.S. at 106.  The plaintiff argued that the proposed merger would

cause a "price-cost squeeze" that would severely narrow its profit margins, thus impairing its

ability to compete.  Id. at 113-14.  Specifically, the plaintiff argued that the newly merged

company would reduce the price at which it sold beef, at the expense of its own short-term

profits, in an attempt to drive smaller competitors, lacking significant reserves, out of the market.

Id.  According to the plaintiff, once the smaller competitors were eliminated, defendant would

increase prices to supra-competitive levels, more than recouping its lost profits.  Id. at 114.

The Supreme Court began its standing analysis by noting that it wasn't clear whether the

plaintiff's theory was that the defendant would lower its prices to some level at or slightly above

its costs in order to compete with the other packers for market share, or that the defendant would

lower its prices below costs to drive the plaintiff out of the market.  Id.  The Court held that the

plaintiff did not have standing to sue on the first theory by reasoning that the antitrust laws do not

protect "small businesses from the loss of profits due to continued competition, but only against

the loss of profits from practices forbidden by the antitrust laws."  Id. at 116.  The Court noted

that antitrust law does not prohibit "vigorous competition," reasoning that:

> To hold that the antitrust laws protect competitors from the loss of profits due to
> such price competition would, in effect, render illegal any decision by a firm to
> cut prices in order to increase market share.  The antitrust laws require no such
> perverse result, for "[i]t is in the interest of competition to permit dominant firms
> to engage in vigorous competition, including price competition.

Id.  (quoting Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050, 1057 (6th Cir.

1984)).

By way of contrast, the Court concluded that a plaintiff proceeding on the second theory

– pricing below an appropriate measure of cost for the purpose of eliminating competitors in the

short run and reducing competition in the long run – could show antitrust injury.  Id. at 118-19.
The court reasoned that this practice "harms both competitors and competition, and thus is
'inimical to the purposes of the antitrust laws.'"  Id. at 118 (quoting Brunswick, 429 U.S. at 489).

As currently articulated, Plaintiff's alleged injuries raise serious concerns as to antitrust
standing.  Plaintiff pleads in the Amended Complaint that its injury stems out of anticipated lost
profits from deals it will lose because customers will charge it "risk premiums"[8] and deals for
which it will not even be seriously considered due to customers' fear that ES&S will become the
de facto industry standard.[9]  At first blush, the injury here appears similar to injury flowing from
predatory pricing schemes, at least in the limited sense that Defendants' size might cause
customers to shortsightedly choose the near-term security of ES&S over the long-term security of
a diversified market, to the ultimate detriment of competition.  Perhaps, if plaintiff could actually
prove that risk premiums were an inevitable result of the Acquisition, and that the premiums
would force Hart and similarly situated firms out of the market, the resulting injury might
reasonably be characterized as competitive injury.

On the other hand, this position may take too broad an approach to defining "injury to
competition."  The Cargill court was quick to characterize as "perverse" the proposition that
antitrust law renders it illegal for "dominant firms to engage in "vigorous competition, including
price competition."  Id. at 116-17 (citation omitted).  Indeed, it is telling that the Supreme Court
drew the injury to competition/competitor line at below cost pricing schemes, whose only

_____

[8]  Plaintiff never explained what it means by a "risk premium."

[9]  Plaintiff also alleges injury due to its loss of the business opportunity to purchase PES
itself.

rational purpose can be to destroy competition.  Here, the same cannot be said for the post-Acquisition, above cost price competition present in the instant case.  There is no allegation that ES&S is pricing below cost ("predatory pricing") or that the new ES&S will do so.  Moreover, without further explanation of the "risk premium" and how it is unique to the voting machines and election services market, it is difficult to distinguish these claims of financial injury from garden-variety loss due to vigorous competition.

### 2.    Relevant Market

An antitrust plaintiff bears the burden of defining the relevant market.  <u>Brokerage Concepts, Inc.</u>v. <u>U.S. Healthcare, Inc.</u>, 140 F.3d 494, 513 (3d Cir. 1998).  "A market has two components, product and geographic."  <u>Id.</u>  With respect to the relevant product market, the Third Circuit has instructed courts to ask "which products would be reasonably interchangeable by consumers for the same purpose."  <u>Id.</u>  "Differences in price, use, and quality of the product and substitutes proffered are factors taken into consideration when determining 'reasonable interchangeability.'"  <u>Korkala v. Allpro Imaging, Inc.</u>, No. 08-2712, 2009 WL 2496506, at *6 (D.N.J. 2009).  The relevant geographic market is the area where a "potential buyer may rationally look for the goods or services he or she needs."  <u>Brokerage Concepts, Inc.</u>, 140 F.3d at 515 (quoting <u>Tunis Bros. Co. v. Ford Motor Co.</u>, 952 F.2d 715, 726 (3d Cir. 1991)).

Here, both parties appear to concede that the relevant market is the national market for voting machines and election services.  Indeed, when jurisdictions require voting machines and election services, it is hard to imagine what other products it might substitute.

### 3.    Substantive Liability

Section 7 prohibits acquisitions of stock or capital where "the effect of such acquisition

may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

The act is prophylactic in nature and is concerned with "probabilities, not certainties."  F.T.C. v.

H.J. Heinz Co., 246 F.3d 708, 713 (D. D.C. 2001) (quoting Brown Shoe Co. v. United States,

370 U.S. 294, 323 (1962)) (quotation marks omitted).

  To assess Section 7 liability, courts employ a burden shifting framework.  E.g., United

States v. United Tote, Inc., 768 F. Supp.1064, 1068-69 (D. Del. 1991).  A plaintiff can make out

a prima facie case of illegality "[i]if it demonstrates that the merger further consolidates an

already highly concentrated market for a given product . . . ."  Id. at 1068 (citing United States v.

Citizens & Southern National Bank, 422 U.S. 86, 120-22 (1975); United States v. Philadelphia

National Bank, 374 U.S. 321, 363 (1963)).  The burden of production then shifts to the defendant

"'to show that the market share statistics [give] an inaccurate account of the acquisition's

probable effect on competition.'"  United Tote, 768 F. Supp. at 1068-69 (quoting United States v.

Ivaco, Inc., 704 F. Supp. 1409, 1420 (W.D. Mich. 1989)).  Although the burden of production

may shift, the burden of persuading the fact-finder as to the anti-competitive effect of the merger

remains with the plaintiff at all times.  Id. at 1069 (citing United States v. Baker Hughes, Inc.,

908 F.2d 981, 983 (D.C. Cir. 1990)).

### i.  Plaintiff's Prima Facie Case

  Plaintiffs typically make out a prima facie case of merger illegality by pointing to

statistical evidence that the merger (1) created a firm with an "undue percentage share of the

relevant market"; and (2) "results in a significant increase in the concentration of firms in the

market."  Philadelphia National Bank, 374 U.S. at 362; see Baker Hughes, Inc., 908 F.2d at 982-

83; United Tote, Inc., 768 F. Supp. at 1069.  Although statistical evidence of market share is not

determinative, see Heniz Co., 246 F.3d at 717 (citing United States v. General Dynamics Corp.,

415 U.S. 486 (1974)), the Supreme Court in United States v. Philadelphia National Bank, held

that a post-merger bank controlling thirty percent of the commercial banking business in the

metro-Philadelphia area constituted a firm controlling an undue share.[10]  374 U.S. at 364.

A more sophisticated quantitative analysis of likely anti-competitive effect is articulated

by the Department of Justice and Federal Trade Commission Merger Guidelines (the

"Guidelines"), which evaluate post-merger market concentration by consulting the HHI.  The

Guidelines define a post-merger index of over 1800 as "highly concentrated."  U.S. Dep't of

Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 1.51 (1997), available at

http://www.usdoj.gov/atr/public/guidelines/hmg.pdf (last visited Sept. 29, 2009).  According to

the Guidelines:

> Mergers that produce an increase in the HHI of less than 50 points, even in highly
> concentrated markets post-merger, are unlikely to have adverse competitive
> consequences . . . .  Mergers producing an increase in the HHI of more than 50
> points in highly concentrated markets post-merger potentially raise significant
> competitive concerns . . . .  Where the post-merger HHI exceeds 1800, it will be
> presumed that mergers producing an increase in the HHI of more than 100 points
> are likely to create or enhance market power or facilitate its exercise.

Id.

## ii.    Defendants' Rebuttal

A defendant may successfully refute a plaintiff's prima facie case by (1) affirmatively

showing that the merger is unlikely to substantially lessen competition; or by (2) discrediting the

data underlying the plaintiff's prima facie case.  Tote, Inc., 768 F. Supp. at 1070.  Defendants can

---

[10]  Antitrust law seems to have shifted towards a more lenient approach to mergers.
Accordingly, while United States v. Philadelphia National Bank remains "good law," its unclear
whether 30% would be sufficient to find liability in 2009.

affirmatively demonstrate that the merger is unlikely to substantially lessen competition by demonstrating inter alia, (1) the absence of barriers to entry; (2) that dramatic changes in the industry render any analysis based on present market shares an inaccurate measure of future market power; and perhaps (3) that the merger results in efficiency gains that outweigh any anti-competitive effect.  See id. at 1082-85.  In addition, a plaintiff may be able to establish the "failing company" exception to Section 7 liability.  See  United States v. Greater Buffalo Press, Inc., 402 U.S. 549 (1971).   Traditionally, a defendant establishes the narrow failing company exception by showing "(1) that the resources of [the acquired company] were 'so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure, and (2) that there was no other prospective purchaser for it."  Id. at 555 (quoting Int'l Shoe v. Fed. Trade Comm'n, 280 U.S. 291, 302 (1938); Citizen Publ'g Co. v. United States, 394 U.S. 131, 138 (1969).

Applying this analysis to the instant case, it appears that Plaintiff may be able to make out its prima facie case.  According to Hart, post-merger ES&S serves approximately 68% of the voting precincts, resulting in a total market HHI of 5072.23.  This represents an HHI increase of 2069.51 points.  Thus, according to the Guidelines, an already highly concentrated market was further concentrated by the Acquisition, giving rise to an FTC presumption that the merger is likely to create or enhance market power or facilitate its exercise.[11]

---

[11]  Incidentally, the Court notes that the hypothetical acquisition of PES by Hart would also result in raising a presumption that the merger is likely to create or enhance market power.  According to Plaintiff's figures, a Hart-PES merger would result in an aggregate market HHI index of approximately 3419, resulting in a roughly 416 point increase from pre-Acquisition levels.  As Plaintiff is quick to point out, however, a Hart-PES merger would be "less anti-competitive" than that of ES&S-PES.

In rebuttal, Defendants promise to show that Plaintiff's measure of competitiveness is wrong from an economic perspective.  Moreover, they argue that PES was a failing business, and that acquiring a business in dire financial difficulties does not eliminate competition as PES was likely to go out of business anyway.

The totality of the circumstances analysis required by Section Seven is fact-intensive. Provided it can assert antitrust standing, Plaintiff may eventually be able to make out its prima facie case.  For their part, Defendants appear poised to make strong arguments that the Acquisition was not anti-competitive.  At this stage, then, it is difficult to say that Plaintiff is "likely to succeed on the merits."

### B.    Irreparable Harm

The burden of establishing irreparable harm rests with the Plaintiff.  Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992).  Plaintiff must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial."  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  In order to show irreparable harm, a party requesting a preliminary injunction must show more than a risk of irreparable harm; it must make a "'clear showing of immediate irreparable injury.'"  Campbell Soup, 977 F.2d at 91 (quoting Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989)).  The "'feared injury or harm must be irreparable – not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'"  Id. (citing ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).

Hart identifies the following as irreparable harms: (1) "injury to its business or property, lost profits, foreclosure and narrowing of markets, customers, and business opportunities, and the

14

diminution of the fair value of Hart's business from injury to its revenue, reputation, goodwill

and value as an ongoing, competitive business concern"; (2) injury to old Diebold customers who

relied on Diebold's familiar practices and who will now be subject to ES&S's supra-competitive

pricing for warranty and services; and (3) harm to the electorate because of lost integrity in the

election system.

The Court can not find irreparable harm.  Here, Plaintiff's waited three weeks from the

date of the Acquisition to file for emergent relief.  As this Court has noted in the past, "[w]here a

Plaintiff delays in seeking preliminary injunctive relief, such delay is evidence that speedy relief

is not needed."  EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp., No. 05-5259,

2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006).  Although the three year delay in EMSL

Analytical is significantly longer than the three weeks here, the same principle should apply.  See,

e.g., Orson, Inc. v. Miramax Film Corp., 836 F. Supp. 309, 312 (E.D. Pa. 1993) (50 day delay

precluded finding of irreparable harm).

Although loss of trade and goodwill are grounds for finding irreparable injury, Opticians

Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1999), the Plaintiff's

allegations of loss do not seem imminent; rather, if the loss occurs at all, it appears likely to

result incrementally as contractual relationships expire.  Moreover, Hart has produced evidence

that voting precincts have discovered and are unsatisfied with Defendants' "price-gouging"

practices.  It stands to reason that this growing dissatisfaction will counteract the business losses

Hart claims to anticipate.  Finally, Hart is an established company, controlling 9% of the national

market for voting machines and election services, whose founders began printing election ballots

in 1912.  The Court should be wary of accepting Plaintiff's arguments that loss of goodwill and

15

reputation are imminent in the face of the undisputed fact that Plaintiff is a well-established, substantial business entity in the election services market.  See Johnson & Johnson Orthopaedics, Inc. v. Minnesota Min. & Mfg. Co., 715 F. Supp. 110, 113 (D. Del. 1989).

### C.      Harm to Defendant

Plaintiff argues that Defendants will only suffer de minimis harm as a result of the requested injunctive relief.  More forcefully, Plaintiff argues that the Court should not strongly consider any harm that results to the Defendants because they have tried to effectuate the Acquisition "under a cloak of secrecy," (Pl.'s Br. at ¶ 24), and have brought this on by their own actions (i.e., a self-inflicted wound).

Defendants counter that they will suffer great harm if the Acquisition were undone. Aside from the great cost of separating a company that has been in the process of merging for almost an entire month, if left to its former devices, PES would lack the financial support needed to continue to operate its business.  As a result, PES would likely cease operations, and the voting precincts with whom PES has contracts would suffer.

Although the FTC requires companies pursuing certain mergers to pre-file with the FTC before effectuating a merger, see 15 U.S.C. § 18a(a), Defendants here show that they did not qualify for mandatory pre-filing.  Plaintiff seems to concede this point.

### D.      Public Interest

Plaintiff argues that the public interest favors the relief it seeks because it will add to the perceived integrity of the voting process.  Moreover, it will allow state and federal antitrust agencies to review the acquisition.

Defendants argue that the public interest favors denial of relief because, if ES&S is divested of PES, PES will fail and its 206 customers, who have upcoming elections between October 6, 2009 and December 15, 2009, will suffer.

The Court is not persuaded by Plaintiff's argument.

### E.     Bond

Federal Rule of Civil Procedure 65(c) requires that the party successfully applying for temporary restraints or a preliminary injunction give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiff fails to address this requirement. ES&S suggests a bond of at least $5 million would be necessary. The Court need not at this time fix the amount of any bond as it is denying the current motion. However, Plaintiff will have to address this issue if a preliminary injunction is entered.

## IV.     CONCLUSION

For the reasons expressed above, the Court denies Plaintiff's application for temporary restraints. That does not foreclose Plaintiff's application for a preliminary injunction.

The parties are directed to complete all discovery on that issue on or before October 30, 2009. The Court will begin trial on the preliminary injunction on November 12, 2009.

Dated:   9-30-2009                                              /s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge

17